U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

## United States District Court for the District of Vermont

Jun 25   3 11 PM '03

CLERK

BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| Scott C. Traudt | > | |
| PLANTIFF | > | |
| | > | |
| Vs. | > | Civil Action, File No. |
| | > | |
| F/V Luke and Sarah, Woodhollow | > | 2:03-CV-180 |
| Trawlers, Neil Stoddard, | > | |
| Intermodal Transport Services, | > | |
| Sunderland Marine Mutual | > | |
| Insurance Company, | > | |
| DEFENDANTS | > | |

## COMPLAINT

This action is filed *pro se* by Plaintiff Traudt to recover maintenance, compensation, curative monies, compensatory damages, punitive damages, payment for permanent disfigurement, nominal damages, and reasonable attorney's fees for permanent disfigurement as a result of an injury that occurred at sea aboard *F/V Luke and Sarah* on or about March 24, 1997. Claims against the vessel and her owners are brought pursuant to 46 USCS 688 et. seq. (the Jones Act) and US Admiralty Law; additional claims against named individual and corporate defendants are brought pursuant to 18 USCS 1961, 1962 (b) (c), 1964 (c), and 1961 (5) commonly referred to as the Racketeer Influenced Corrupt Organization Act. Traudt also brings this action pursuant to 18 USCS 4 (Misprision of a felony) with notice given of the facts contained herein to the US Attorney's Office, Burlington, VT, and the United States Navy Judge Advocate General Division, Washington D.C. Traudt is entitled to file this action at no cost because as a seaman, pursuant to the Jones Act, filing fees are waived.

## Plaintiff

1. Plaintiff Scott Traudt ("Traudt") is a resident of Vermont now residing in Orange County, town of Tunbridge, Vermont. He is a licensed US sailor currently under contract to the US Navy Military Sealift Command, and holds the rating of Able-Bodied Seaman/Lifeboatman, and was at the time and place of the injury to his person a commercial fisherman under the auspices of 46 USCS 10601.

**Defendants**

2. Defendant *F/V Luke and Sarah* ("*Luke*") is a commercial fishing trawler homeported in Galillee, RI, owned in whole or in part by James Thayer ("Thayer") as a property of Wood Hollow Trawlers, Inc ("Trawlers").

3. Defendant Neil Stoddard ("Stoddard") is an insurance adjuster and/or claims representative for Intermodal Transport Systems of Braintree, MA.

4. Intermodal Transport Systems ("ITS") is an insurance consultantcy and/or claims investigation and adjustment company based in Braintree, MA.

5. Sunderland Marine Mutual Insurance Company ("Sunderland") is a British company doing business in the US marine industry as a vessel underwriter.

**Venue**

6. Traudt is a resident of Vermont and as a US seaman is legally entitled to present this claim at any US federal court by virtue of original jurisdiction. Parallel RICO claims nest in any US District Court by virtue of original jurisdiction.

**Facts**

7. On or about March 24, 1997, while *Luke* was conducting fishing operations in the North Atlantic, Traudt suffered a crushing injury to his left middle finger while attempting to set the net of *Luke*.

8. Traudt was a seaman aboard the *Luke* at the time of his injury.

9. The proximate cause of Traudt's injury was the fisherman operating the controls of the *Luke's* hydraulic net reel feeding the net chains out too fast, and allowing too much slack to build in the unsupported chain causing Traudt's left hand to be slammed into the port side stern when the chain fell free over the stern of the *Luke*.

10. *Luke* did not return to port immediately after Traudt's injury.

11. As an injured sailor, Traudt was entitled to maintenance, compensation, and cure under the Jones Act.

12. Stoddard visited Traudt at Traudt's home in Warwick, RI on or about April 1st, 1997 to discuss Traudt's injuries.

13. Stoddard told Traudt he had a right to $15 a day maintenance and cure.

14. Stoddard possessed a black, palm-sized micro-cassette recorder.

15. Stoddard promised Traudt he would get all his lost wages after his injury.

16. Traudt was informed by Stoddard that as a member of the crew, he would be getting full-share.

17. Traudt signed no fishing agreement with *Luke* pursuant to 46 USCS 10601.

18. Stoddard was acting as an agent for Hull and Cargo Surveyors, which was the name of ITS before its corporate identity crisis.

19. Stoddard was not a member of the crew of *Luke*.

20. Stoddard is not an owner, official, or employee of Trawlers.

21. Stoddard is not an attorney.

22. Stoddard has stated under oath that he has handled over 1500 claims for maritime injuries. *Richards v. Relentless*, 2002-2337, Deposition of Neil Stoddard.

23. ITS began paying Traudt $15 a day maintenance for his injuries on or about April 7, 1997.

24. ITS knew or should have known that the case of *Smith v. US*, 943 F. Supp. 159 (DRI 1996) clearly made it federal law in Rhode Island that an injured mariner was entitled to at the very least the actual expenditures for his food and lodging while he was rehabilitated.

25. Stoddard, as agent for ITS, made no inquiries into Traudt's actual expenditures.

26. Stoddard has claimed he has no idea what maintenance is for. *Richards v. Relentless,* 2002-2337, US Court of Appeals for the 1st Circuit, Brief of Appellant, pg. 69. (Attachment A).

27. Traudt was treated for his injuries at South County Hospital and by Dr. Mark Coppes of Wakefield, RI.

28. Stoddard did not advise Traudt he had a right to an attorney.

29. Stoddard advised Traudt that all Traudt was entitled to was $15 a day "by law" to live on.

30. Stoddard stated to Traudt that Traudt "had gotten two big checks, and that ought to hold you for a while," indicating that these two paychecks Traudt earned aboard the *Luke* were to provide for Traudt while Traudt recovered from injuries.

31. Stoddard did not tell Traudt that Traudt had an unbeatable case in admiralty for injuries aboard the *Luke*.

32. Stoddard did tell Traudt that he was entitled to maintenance at a rate of $15 a day, and medical bills, but only mentioned lost wages when Traudt asked him about them.

33. Stoddard later denied liability for Traudt's injuries 7 months after he sustained them, even though all crew members were aware or had witnessed the accident. (Attachment B).

34. Stoddard, ITS and Sunderland's denial of liability 7 months after the injury constituted bad faith on their part, as they were in an immediate position to make such a denial – as wrong and self-serving as it may have been – no more than a month after Traudt's injury.

35. The injuries Traudt sustained were of a permanent nature resulting in disfigurement and loss of range of motion. (Attachment C).

36. Traudt settled the case without an attorney in December, 1997, for approximately $16,800, under deep financial distress. (Attachment D).

37. Stoddard once cut off Traudt's paltry $15 maintenance payments for failing to appear at a physical therapy session due to unrelated illness. (Attachment E).

38. Stoddard is not a medically trained person, but reached and made a medical conclusion to Traudt's then-attorney Patrick Fayle that, because Traudt had missed a doctor's appointment, the injury to Traudt's finger (in which it was broken into approximately 8 parts plus fragments) was not of a permanent nature. (Attachment E).

39. Traudt hired Attorney Patrick A. Fayle (hereinafter "Fayle") to represent him in an admiralty case arising from Traudt's injury, at sea, aboard the *F/V Luke and Sarah* on March 21, 1997. (Attachment F).

40. Fayle did not advise Traudt of his special rights as a "ward of the admiralty."

41. Fayle did not advise Traudt of any rights.

42. Traudt informed Fayle on numerous occasions that he could not live on $15 a day. (Attachment G).

43. Fayle did not interview any witnesses to the injury to Traudt. (Attachment H).

44. As part of the contingency fee arrangement, Fayle was supposed to work diligently to protect my interests. Fayle did not.

45. As part of the contingency fee arrangement, Fayle was supposed to file suit against the *F/V Luke and Sarah*. He did not.

46. As part of the contingency fee arrangement, Fayle was supposed to interview witnesses, investigate the claims, handle medical evidence, and bring a case to trial. He did not.

5

47. Repeated requests as early as June 1997, to file suit, were denied by Fayle. There are lengthy correspondences between Traudt and Fayle, as well as phone records, which verify this fact.

48. Fayle did not ever familiarize himself with the *Smith* standard for 46 USCA 688 cases, nor did he do any legal research at all on behalf of Traudt.

49. Fayle repeatedly stated to Traudt (while he represented Traudt) that negotiations were going well with the insurance adjuster. They were going so well, in fact, that Fayle refused to commence suit despite numerous pleas from Traudt to do so. He stated that when Traudt wanted to sue he *"was able to persuade Defendant to continue with the ongoing settlement negotiations as they were proceeding well."* (Attachment I).

50. Fayle later said this in answer to the Rhode Island Supreme Court's Disciplinary Counsel in answering Traudt's bar complaint against him: *"The fact that six months had passed since the Agreement [the retainer agreement] had been signed was due to a combination of unresponsiveness on the part of the insurance carrier..."* (Attachment X). I

51. Traudt had been lied to by his own attorney repeatedly over the status of the case.

52. Fayle's sole involvement in this case could be aptly summarized to include phone calls to the adjuster representing the vessel being sued, the writing of several letters, and the return of phone calls to Traudt explaining why suit wasn't filed.

53. Traudt's fired Fayle in late November, 1997, by a facsimile sent to his office informing him that, basically, he wasn't doing his job, and that his lame excuses for not filing suit after 7 months were no longer to be tolerated. This facsimile was also sent to an insurance adjuster – one Neil Stoddard of Hull and Cargo Surveyor's of Braintree, Massachusetts, shortly after it was sent to Fayle.

54. Traudt's geographic location (in Nevada) at the time of suit settlement precluded him finding another admiralty attorney. They are rare in the Sierra Nevadas, almost as rare as finding a competent admiralty attorney in North Kingstown, Rhode Island.

55. Traudt signed a "release" in San Francisco, California. It was signed without a full knowledge of his rights in admiralty, under duress, without counsel present, without adequacy of consideration. (Attachment D).

56. Traudt's settlement amount of approximately $16,800 was significantly less than what would have been achieved by competent legal services.

57. Traudt's settlement amount is invalid due to the lack of adequacy of consideration given Traudt.

58. Traudt has suffered a financial loss of $50,000 in lost wages and between $50-100,000 in payment for the disfigurement to his finger.

59. On or about August 1st, 2000, Traudt discovered in other litigation against Fayle for breach of contract and legal malpractice that he was rightfully entitled to a maintenance rate far greater than the $15 a day Defendants made him live on.

60. The Federal Poverty Guidelines for 1997 state that $22 was the bare minimum threshold at which "poverty" began. (Attachment K).

61. It is the pattern and practice of Stoddard, ITS, and Sunderland to "starve out" injured seamen by paying them a rate that forces them to accept ridiculously low settlements for injuries and/or to return to work injured and/or to crush any potential litigation against them by stalling while an injured party depletes the financial resources he'd need to survive while in litigation.

62. It is the pattern of Stoddard, ITS, and Sunderland to pay a greater rate than $15 a day to select injured individuals if such individuals can be reasonably calculated to not proceed with litigation and/or assert his/her federal maritime rights and priviledges and are quite content to be treated only marginally better than the cargo aboard the *Amistad*.

63. The Jones Act was codified by Congress to preserve a strong pool of American sailors skilled in the maritime trades who may be drew upon for national emergencies- especially sealift emergencies – when necessary.

64. Stoddard, ITS, and Sunderland, together and/or in concert with others, deliberately design policies and actions to maximize profit at the expense of US sailors and the US national security by starving out injured sailors. *Richards v. Relentless*, supra, citing *Pino v. Protection Marine Insurance, Co.*, 454 F. Supp. 210, 225 (D. Ma 1978) affirmed in part reversed in part 599 F 2d 10 (1st Cir. 1979).

65. Stoddard, ITS, and Sunderland, are neither employees, officials, owners, or partners of Trawlers or Luke.

66. Stoddard, ITS, and Sunderland, knew or should have known that the $15 a day paid Traudt was below the federal poverty guidelines for 1997.

67. Stoddard, ITS, and Sunderland, knew or should have been aware of *Smith* and Jones Act maintenance requirements for US mariners and in particular to the then injured Traudt.

68. Sunderland has owners of commercial fishing vessels on its board of directors.

69. The relationship between *Luke* and Traudt was one more akin to fiduciary and beneficiary.

70. Stoddard, ITS, and Sunderland conspire to deny injured sailors their rights under admiralty and the Jones Act.

71. Stoddard, ITS, and Sunderland have committed acts reasonably calculated to harm injured US mariners.

72. Stoddard, ITS, and Sunderland have diminished the maritime reserve of the US government by not "keeping injured sailors whole."

73. Stoddard, ITS, and Sunderland have engaged in a pattern of racketeering across state lines, in interstate commerce.

74. Injured US mariners forced to survive on $15 a day may suffer true financial hardship that causes damage to their credit ratings with lenders.

75. Federal form SAF-186 regarding security screenings of newly hired federal mariners precludes employment if one's credit history is damaged to a certain degree.

76. Trawlers did not pay Traudt a full share for either trip he made aboard *Luke*.

77. Traudt was paid ¾ share for both trips he made aboard *Luke*.

78. Stoddard informed Traudt prior to his retention of Fayle that all he was entitled to only those wages he missed up until discharge from a doctor's care – but that he would get full share.

79. Court documents supplied to Traudt in a hearing of *Fayle v. Traudt* in Washington County, RI, on June 16th revealed for the first time to Traudt that he was only paid ¾ share for his time onboard *Luke*. (Attachment L).

80. Court documents supplied to Traudt in a hearing of *Fayle v. Traudt* in Washington County, RI, on June 16th revealed to Traudt a pattern of racketeering activity on the part of ITS, Stoddard, and Sunderland., when this information was coupled with *Richards* testimony and other investigations on the part of Traudt.

81. Court documents supplied to Traudt by Attorney Merlin O'Keefe – in particular, the deposition testimony of Stoddard in *Richards* – in May, 2003, initiated Traudt's inquest as a "citizen attorney general" as encouraged by the RICO statutes and enhanced by Traudt's special rights as a "ward of the admiralty" under federal maritime law.

82. Traudt's had agreed to the release only when told he was getting full share (and in total ignorance of his other previously mentioned rights).

83. Stoddard, ITS, and Sunderland committed repeated acts of fraud against Traudt.

84. Stoddard, ITS, and Sunderland acted maliciously, wantonly, recklessly, and tortiously against Traudt.

85. Stoddard has directed injured mariners to Attorney Tom Hunt of New Bedford, MA – and, upon information and belief, to no other attorneys, as part of his control, command, conspiracy, knowledge, organization and enjoyment of a racket within a racketeering activity.

86. The racket within a racketeering activity involves a) Stoddard initialing contact with injured Rhode Island mariners (there are two known) as part of his duties to ITS and Sunderland b) instructing these mariners to contact Attorney Tom Hunt and/or supplying Hunt's contact information to them. Stoddard was the nexus of the liaison between Hunt and his new clients; these injured sailors had no listed phone numbers and in one case an injured mariner was living in a house where the girlfriend of the injured sailor had her phone in her maiden name. One sailor had only a cellphone; Hunt has no RI offices. By process of elimination, and noting that contact information for these injured mariners put Stoddard with both motive and superior knowledge to provide clients to Hunt, there could be no other answer for the injured Galillee-based sailors to have found this remote attorney.

87. The release Traudt signed with Trawlers is invalid as per recent rulings as to seaman's rights under admiralty in the 9th Circuit Court of Appeals, and the general holdings with regards to suits in equity.

88. The defendant's willful failure to pay maintenance while Traudt was injured forced him to consume his savings to live, forced him to relocate to less expensive housing, forced him to prematurely discharge himself from a doctor's care while still injured in order to meet the "available for light duty work" clause of the unemployment insurance program as administered in RI in 1997.

89. Stoddard informed Traudt in December, 1997, that a finger injury such as Traudt's usually was settled for no more than $15,000.

90. The true rate of crushed finger injury settlements varies between $75,000 to $150,000.

### Count 1: Back pay.

Numbers 7 through 90 are hereby incorporated here by reference.

91 Traudt was entitled to a "full share" of the wages aboard Luke for the two trips he made on that vessel in 1997.

92 The amount referenced in Number 93, above, is $2475.09.

93 Traudt hereby makes demand for such back pay, with interest.

## Count 2: Willful failure to pay maintenance.

Numbers 7 through 90 are hereby incorporated here by reference.

94 Traudt was underpaid maintenance by Trawlers for the duration of his injury.

95 Traudt was and is due a total of $7825 in maintenance payments from the date of his injury to his return to commercial fishing on February 1, 1998.

96 Traudt is entitled to triple damages based on Trawlers' willful failure to pay maintenance in the amount of $23475.

97 As a proximate cause of Trawler's actions, Traudt has been damaged.

## Count 3: Vessel unseaworthiness.

Numbers 7 through 90 are hereby incorporated here by reference.

98 The proximate cause of Traudt's injuries was the negligent operation of the vessel's hydraulic net controls by a member of *Luke's* crew.

99 Wherefore: Traudt prays for the recovery of lost compensation in the amount of between $35000-50000 (to be calculated from financial information being supplied by Trawlers as a result of an order in *Fayle v. Traudt*) for lost wages between March 24, 1997 and his return to fishing on February 1, 1998.

## Count 4: Tortious interference.

Numbers 7 through 90 are hereby incorporated here by reference.

100    Stoddard interfered with the contract between Traudt and the *Luke*/Trawlers, and induced *Luke*/Trawlers to do acts it might not reasonably be calculated to have done or have allowed done to Traudt would that Stoddard properly informed *Luke*/Trawlers of their fiduciary, admiralty, and Jones Act responsibilities to Traudt.

101    Stoddard interfered with the employment contract between Traudt and *Luke*.

102    Stoddard has acted tortiously and maliciously towards Traudt.

103    As a proximate result of Stoddard's acts and omissions to act, Traudt has been damaged.

104    Wherefore: Traudt prays for compensatory damages in the amount of $25,000 and punitive damages in the amount of $100,000.

## Count 5: Tortious conduct/illegal practice of law, ITS.

Numbers 7 through 90 are hereby incorporated here by reference.

105    ITS allowed and continues to allow its agent, Stoddard, to instruct – and to instruct poorly – injured mariners in matters of law.

106    ITS allowed its agent, Stoddard, to instruct – and instruct poorly – the injured Traudt in matters of law.

107    ITS has allowed Stoddard to practice law illegally and to advise injured mariners in numerous cases, with harm resulting. The harm is an ongoing construct of ITS, Stoddard, and Sunderland.

108    As a proximate cause of ITS' acts and omissions to act in not stopping Stoddard — and in fact, condoning such behavior due to its vicious profitability with the uneducated, "poor, friendless sailor" – Traudt has been damaged.

109    Wherefore: Traudt prays for compensatory damages from ITS in the amount of $50,000 and $500,000 punitive.

## Count 6: RICO/Stoddard

Numbers 7 through 90 are hereby incorporated here by reference.

110    Stoddard is a prime component and the central figure as the organizer, manipulator, and 'front man" of a Racketeer Influenced Corrupt Organization as defined by 18 USCS XXX.

111    Stoddard's action violate the laws of the United States, are detrimental to the US interest in that such callous care at his hands, his tortious conduct, and his corruption provide much disincentive for mariners to stay in this profession.

112    Stoddard knowingly and with malice handles injured mariners in such a way as to keep himself, ITS, and Sunderland at optimal profits based on his ability to starve out injured mariners by inhumanely low maintenance payments, fraud, denial of claims, and bad faith.

113    Stoddard has perjured himself routinely in testimony under oath in *Richards*.

114    As a proximate cause of Stoddards' acts and omissions to act in furtherance of a RICO conspiracy, Traudt has been damaged by a RICO conspiracy.

115    Wherefore: Traudt prays for compensatory damages in the amount of $25,000, and the treble damages provided for by RICO, and costs and reasonable attorneys fees for acting *in loco* Ashcroft.

116    Wherefore:. Traudt prays for punitive damages in the amount of $250,000.

## COUNT 7: RICO/ITS

Numbers 7 through 90 are hereby incorporated here by reference.

117    ITS has provided material support, officing, operating capital, transportation, legal cover, and other instruments of conspiracy for the use of Stoddard together with and in concert with Sunderland and,

potentially, other insurers acting as Sunderland has in the cases of Traudt and Richards.

118   ITS is part of a RICO operation, and an intrinsic part at that.

119   ITS has acted wantonly and maliciously towards Traudt in allowing and/or instructing Stoddard to misrepresent Traudt's rights, starve out Traudt at a knowingly illegal maintenance rate that "shocks the conscience," fraudulently inflate Traudt's pay rate aboard *Luke* during settlement negotiations, and to lie to Traudt about similar settlements for similar injuries.

120   As a proximate cause of ITS' acts and omissions to act in furtherance of a RICO conspiracy, Traudt has been damaged.

121   Wherefore: Traudt prays for compensatory damages in the amount of $25,000, and the treble damages provided for by RICO, and costs and reasonable attorneys fees for acting *in loco* Ashcroft.

122   Wherefore: Traudt prays for punitive damages in the amount of $250,000.

## COUNT 8: RICO/Sunderland

Numbers 7 through 90 are hereby incorporated here by reference.

123   Sunderland is a British-based multi-national corporation.

124   Sunderland was and continues to be engaged in a pattern of racketeering activity with ITS and Stoddard.

125   Sunderland may not be aware, however of the "racket within a racket" Stoddard is running with Attorney Tom Hunt in New Bedford, MA.

126   Sunderland seeks to maximize profits by flouting US admiralty law – in particular, the maintenance rate paid injured sailors.

127   Sunderland's pattern includes: directing adjusters (Stoddard in particular) to starve out sailors on injuries, to make corporate awards to adjusters who compete to keep claims as low as possible, to conduct

activities reasonably calculated to damage the pool of US sailors who might be called upon to provide emergency Navy personnel or sealift support in the event of a sealift crisis, and to encourage tortious conduct as a viable claims adjusting tool.

128    As a proximate cause of Sunderland's acts and omissions to acts in furtherance of a RICO conspiracy, Traudt has been damaged as part of a RICO activity.

129    Wherefore: Traudt prays for compensatory damages in the amount of $25,000, and the treble damages provided for by RICO, and costs and reasonable attorneys fees for acting *in loco* Ashcroft.

130    Wherefore: Traudt prays for punitive damages in the amount of 250,000.

Traudt hereby demands a jury trial, reasonable attorney's fees, and any other relief this court deems necessary.


SCOTT TRAUDT
PRO SE

I hereby certify that a true copy of the foregoing was delivered and process was completed by agent to Trawlers by and through Attorney Barbara J. Mulholland, 380B Main St., Wakefield, RI 02879 and to Stoddard, ITS, and Sunderland by and through the Rhode Island Insurance Commissioners Office, Department of Business regulation, 233 Richmond St., providence, RI 02903 this ___ day of June, 2003.

SCOTT TRAUDT

15

Attach A: Stoddard trial testimony in
Richards v. Relentless

When that opportunity came, Richards made what use of it he could and this

exchange took place:

Mr. O'Keefe:      You told me that you paid Mr. Richards

$15.00 maintenance?


Mr. Stoddard:     That is correct.


Mr. O'Keefe:      And you said that was a standard rate;

is that correct?


Mr. Stoddard:     That is the rate we're authorized to

pay.


Mr. O'Keefe:      And that's by Sunderland?


Mr. Stoddard:     That is correct.


Mr. O'Keefe:      And what does that $15.00 a day encompass?

Mr. Stoddard:     It's maintenance.

Mr. O'Keefe:      And can you tell the ladies and

                  gentlemen of the jury what

                  maintenance is?

Mr. Stoddard:     Maintenance, the right to maintenance is the right

                  accorded to seamen under general maritime law and

                  it's just a daily rate that's been set; and vessel

                  owners are required to pay that amount to seamen

                  when they're not in the hospital.

Mr. O'Keefe:      And what is that amount suppose to

                  enable a seaman to do?

Mr. Stoddard:     I have no idea.

Mr. O'Keefe:      Well, isn't it a fact that it is--it's

                  supposed to be reimbursement for his

69

actual expenditures for housing and
food?

Mr. Olenn:           Objection.

Mr. Stoddard:        I don't believe...

The Court:           Sustained, and the answer may be
                     stricken.

Mr. O'Keefe:         Now you gave --you discussed  legal a
                     lot of matters with Mr. Richards in the
                     particular case; correct?

Mr. Stoddard:        That would be subject to interpretation.
                     I discussed matters with him.

Mr. O'Keefe:         Other than the $15.00 per day that Mr.
                     Richards was getting when he was as

you said not on the ship and not in the hospital, what other income did he have coming in do you know?

Mr. Stoddard:      I have no idea.

Mr. O'Keefe:       He wasn't working on the ship?

Mr. Stoddard:      No he was not.

Mr. Olenn:         Objection.

The Court:         Sustained.  The jury will disregard the question and answers.

Mr. O'Keefe:       Did you make an inquiry to Mr. Richards as to his actual expenditures for living?

71

Mr. Olenn:          Objection.

The Court:          Overruled.

Mr. Stoddard:          No, I did not.

Mr. O'Keefe:          And this $15.00 a day was

designed to meet his living

expenses, is that correct?

Mr. Olenn:          Objection.

The Court:          Sustained.  The Jury will disregard.

Mr. O'Keefe:          Who instructed you to pay the $15.00 a

day, do you recall?

Mr. Stoddard:          Specifically no I don't recall.  That's

Sunderland's policy.

72

Mr. O'Keefe:     Do you have an opinion

whether or not a person--

well, do you know where

Mr. Richards was living at

the time you interviewed

him at his parents' home

and at the time leading up

to the signing of the

release?


Mr. Stoddard:     He was living at his parents' home in

Narragansett, Rhode Island.

*Trial Proceedings of 12 September, 2002 at 115-117*, App. 154-156.

(Emphases Supplied)


Given Mr. Stoddard's admission that he did not know what the fifteen-dollars

($15.00) a day in maintenance was supposed to enable a seaman to do and not

making any inquiry as to actual expenditures there is no way he could have

"fulfilled his obligation to bring home to the Plaintiff an understanding of the rights




**PATRICK A. FAYLE**
ATTORNEY AT LAW

*Attachment B*

2358 SOUTH COUNTY TRAIL
EAST GREENWICH, RI 02818

TEL (401) 886-5004
FAX (401) 886-5100

November 4, 1997

Mr. Scott Traudt
P.O. Box 3098
Winnemucca, NV 89446

Re:   Personal Injury ICO Scott C. Traudt (3/21/97)

Dear Scott:

I spoke with Hull & Cargo's representative, Neil Stoddard, today after receiving their most recent letter yesterday in which they, among other things, increased their offer to settle this matter via payment to you of the sum of $14,687.00. Their position, as near as I can understand it, is that there is no liability because there was no unseaworthy condition, no negligence, etc. In fact, Mr. Stoddard quoted from your statement to him (a copy of which has not yet been provided to me) in which you have allegedly corroborated the foregoing. Obviously if you said those things it is not going to be particularly helpful, but if we could still get a settlement in the amount you feel is adequate this could obviate the necessity of ever litigating the liability issue.

In this regard and with reference to my letter to you dated September 24th, I propose the following, that is, that we go back and tell them what our "bottom line" is, for example, $30,000.00 (you tell me the figure keeping in mind the figures set out in the aforementioned letter). We see what they have to say and that is the last of it. If their counter is not sufficient, no more negotiating.

Sincerely,

Patrick A. Fayle

South County Orthopedics
& Physical Therapy, Inc.

Joseph B. Fitzgerald, MD
Robert C. Marchand, MD
David S. Burns, DO
Mark A. Coppes, MD

One High Street
Wakefield, RI 02879

Tel. 401-789-1422
Fax. 401-782-4412

Mark A. Coppes, M.D.

PT:    Scott Traudt
DOB:

**3/25/97:** Scott is a 31 yo. white male who was working 4 days ago for a fishing boat and sustained an injury to the left hand with a chain. Apparently, this caused his hand to be struck bluntly and he heard an audible snap and had immediate pain in the left middle finger in the proximal phalanx region. He was out to sea for a total of 3 days and supported it with ice, elevation and decreased use. He presented to the ER at SCH on 3/25/97 at 1:28 a.m. He was arranged at that time to be seen today.

EXAMINATION: The pt. appears in his normal state of health with his left hand in a volar splint. Exam of the wrist and metacarpal region shows he is nontender to palpation. There is some dorsal soft tissue swelling noted with no evidence of any significant increased warmth or streaks. There is no break in the skin or level of excoriation. He is tender to palpation over the proximal phalanx. The MCP at the collateral ligament attachment does not have any significant tenderness. The PIP joint was not probed for continuity through ROM due to the intra-articular involvement. The remaining digits are all nontender to palpation. Neurovascular exam is intact.

X-RAYS: Taken in the ER showed a comminuted, complex proximal phalanx fx. which extends into the PIP joint. On the lateral views, there is no significant angulation noted. On the AP view, there does not appear to be any deviation from alignment. There is, however, a small level of PIP intra-articular involvement, but it appears to be less than 1 mm.

PLAN: A discussion was carried out with the pt. concerning the best treatment plan. I feel at this point in time if alignment is maintained, operative intervention is not necessary. Perpendicular to the middle phalanx itself was then performed with an AP radiograph to determine whether or not the intra-articular involvement was greater and it appeared to be similarly stable less than 1 mm. He was then placed into a short arm gauntlet cast with extra protection over the aluminum outrigger. He will be seen back in 10 days for reevaluation. I have discussed with him to keep this extremity elevated and to report to us if he has any problems with soft tissue swelling or neurovascular compromise.
MAC/dlh



South County Orthopedics
& Physical Therapy, Inc.

Joseph B. Fitzgerald, MD
Robert C. Marchand, MD
David B. Burns, DO
Mark A. Coppes, MD

One High Street
Wakefield, RI 02879

Tel. +01.789.1422
Fax. +01.782.6810

David B. Burns, D.O.

PT:   Scott Traudt
DOB:  10/24/65

**3/31/97**: Scott presents for evaluation. Apparently, he has had complaints of pain over the finger recently and is concerned about some blackness in the hands. He is concerned that the cast may be too tight, I have talked to him over the phone and he would prefer that he was evaluated.

EXAMINATION: The cast and splint appear to be satisfactory. There is no evidence of tightness. Apparently, the pt. had a short episode of decreased sensibility over the little finger which has resolved. Neurosensory exam is benign. There is ecchymosis diffusely over the digit, but that is expected due to the amount of trauma due to the crush injury.

PLAN: Scott will f/u again as suggested by Dr. Coppes. He additionally has some back complaints. I have reviewed with him some exercises that would be helpful for this and he will f/u with Dr. Coppes to review this at more length.
DBB/dlh
cc: Workers' Compensation

**4/4/97**: Scott is seen for f/u. He had seen Dr. Burns last week with complaints of swelling in the hand and decreased sensation.

EXAMINATION: Shows that he has normal sensation. There is no significant discoloration or soft tissue swelling. He has stated that the pain has decreased significantly. He has some other secondary complaints mostly having to do with the cast immobilization. Of the remaining part of the hand and forearm, there is no evidence of any excoriations or open areas.

X-RAYS: AP and lateral in the splint show that the joint space at the PIP level appears to be well-maintained without any articular offset. The overall alignment, both on the AP and lateral, appears to be satisfactory without any significant change.
IMPRESSION:

PLAN: We will keep him immobilized for an additional ten days and see him back then for x-rays out of plaster.
MAC/egp

## South County Orthopedics & Physical Therapy, Inc.

Joseph B. Fitzgerald, MD
Robert C. Marchand, MD
David B. Burns, DO
Mark A. Coppes, MD

One High Street
Wakefield, RI 02879

Tel. 401.789.1422
Fax. 401.782.6810

Mark A. Coppes, M.D.

**PT:** Scott Traudt
**DOB:** 10/24/65

**4/16/97:** Scott is seen for f/u. He had sustained a proximal phalanx fx. of the left middle finger. He was taken out of his gauntlet splint.

EXAMINATION: The skin appears to be slightly dry and macerated but otherwise intact. He is nontender over the proximal phalanx of the middle finger. He has gentle motion of the DIP, PIP and MCP joints and no evidence of any fx. mobility.

X-RAYS: AP and lateral of the proximal phalanx show good alignment of the fx. fragment despite the comminution with some good callus. There is no loss of alignment on the AP or lateral and no extension into the articular surfaces.

PLAN: I have given Scott an aluminum splint and have set him up to see the PTs downstairs for ROM and strengthening exercises, particularly targeted to the middle finger PIP and MCP joints. We will see him back in 10 days to 2 wks. for reevaluation.
MAC/dlh
cc: Workers' Compensation

**4/30/97:** Scott is seen for f/u of a proximal phalanx fx. of the middle finger.

EXAMINATION: He has ROM in the MCP of 0-80°, a 15-20° extension lag of the PIP to flexion of 85°, and DIP has full ROM at 0-35° with a total active motion of 200° out of 240°. Clinically he is well healed. He has stable collaterals. He is nontender over the fx. site.

X-RAYS: AP and lateral show some volar abundancy of callus but otherwise good anatomic alignment.

PLAN: I have discussed with Scott that we will allow him to continue with PT for an additional 10 days and then see him back for final motion check. At that point in time, I would expect him to probably be able to return to full activities.
MAC/dlh
cc: Workers' Compensation

**South County Orthopedics**
**& Physical Therapy, Inc.**

Joseph B. Fitzgerald, MD
Robert C. Marchand, MD
David B. Burns, DO
Mark A. Coppes, MD

One High Street
Wakefield, RI 02879

Tel. 401.789.1422
Fax. 401.782.6810

Mark A. Coppes, M.D.                    PT:   Scott Traudt
                                        DOB:  10/24/65

**5/14/97**: Scott is seen for f/u.

EXAMINATION:   His finger with the proximal phalanx fx. still shows a slight extension lag of about 15°. He is able to flex it to near 90°. The MCP is 0-85° and the DIP is 0-45°. He does not feel that his grip strength has adequately returned to normal which would be necessary to go through the rigors of his job which is handling up to 50 lbs. in that one hand with chain manipulation.

PLAN:  I feel he will probably be ready within 2 wks. I have told him to aggressively work at grip strength exercises and we will see him in 2 wks. for reevaluation. He will see Kristen downstairs for grip strength monitoring today and prior to the next appointment.
MAC/dlh
cc: Workers' Compensation

**5/28/97**: Scott is seen for f/u. He has been working with PT and has increased his grip strength.

EXAMINATION:  The fx. is well healed. He has the ability to close his fist, and when he extends, he has about a 10° lag at the MCP due to the fx. of the proximal phalanx.

PLAN:  I think Scott has improved significantly enough to return to work. We will see him back in 1 mo. and make a final determination of his ROM to see if there is any long-term discrepancy.
MAC/dlh
cc: Workers' Compensation

6/9/97 - cc Chart atty Tayle form 3/97

**South County Orthopedics
& Physical Therapy, Inc.**

Joseph B. Fitzgerald
Robert C. Marchand
David B. Burns, DO
Mark A. Coppes, MD

One High Street
Wakefield, RI 02879

Tel. 401.789.1422
Fax. 401.782.6810

Mark A. Coppes, M.D.

PT:   Scott Traudt
DOB:  10/24/65

**8/13/97:** Scott is seen for f/u exam for his left middle finger and for a new complaint of right wrist fx. He had been out in Nevada, apparently injured his right wrist, and had been seen by a local orthopedic surgeon who casted him. At that time, he had complaints of mid carpal pain.

<u>EXAMINATION</u>: The cast was removed and palpation over the distal radius, distal radioulnar joint and ulnar styloid is negative. The proximal carpal row, radioscaphoid ligament, scapholunate, lunotriquetral, and TFCC regions are nontender. There is some minor tenderness in the capitate region in its mid portion but otherwise unremarkable for the remaining carpometacarpal articulations. He has ROM of the left 4th finger from 0-70° at the DIP, 15° extension lag although passively able to go to 0-90° at the PIP, and 0-100° at the MCP.

<u>X-RAYS</u>: In plaster do not show any evidence of abnormalities. Radiographs out of plaster show what appears to be a hairline fx. through the capitate in a diagonal type distribution. There does not appear to be any displacement and this is also visualized on the lateral, as well. Radiographs of the 4th middle finger show good alignment on both the AP and lateral views with no significant angular deviation.

<u>PLAN</u>: I have discussed with Scott that I think that continued immobilization for the presumed capitate fx. would be beneficial. As he is returning to Nevada, I will allow his final care to be rendered there. A short arm cast was applied. In reference to his left 4th finger fx., I feel he has reached a satisfactory conclusion and has a small 15° extension lag but otherwise has probable complete ROM in a functional aspect. We will see him again on a p.r.n. basis.
MAC/dlh

*Fax 886-5700 to Lawyer. Thx /C*

*Attach To*

# THIS IS A GENERAL RELEASE

**WARNING — READ CAREFULLY every word printed or written on both sides of this paper. By signing this paper YOU AGREE to give up every right against all the parties and vessels mentioned in this paper which you ever had, you now have, or you may in the future have because of any matter or anything which ever happened from the beginning of the world up to the time you sign this paper.**

I, Scott C. Traudt ......................................... Age 32

Married or Single .. Single.. Address P.O.B. 3098 Winnemucca NV 8994

(Write your own name and age)

in exchange for the sum of Eighteen Thousand Nine Hundred Sixty-one-------------
(Maintenance $675.00; Cure $1,599.50; Settlement $16,687.00 new money)
Dollars and 50/100 Cents ($ 18,961.50***) lawful money of the United States of America

which I have received, do hereby ..... release ........................ and forever

(Write the word "release" to show that you know what you are doing)

discharge Woodhollow Trawlers, Inc.; F/V Luke & Sarah (ON 906149); Sunderland
Marine Mutual Insurance Company Ltd.; Salvus Bain (Management) Ltd.;
Royal Insurance; Ocean Marine Underwriters, Inc.; Hull and Cargo Surveyors, Inc./
USP&I Agency, their

heirs, executors, administrators, successors and assigns, and all his or their vessels and in particular the  F/V LUKE & SARAH   (ON 906149)

and the owners, operators, agents, charterers, masters, officers, and crews, of said vessels of each and every right or claim which I now have, or may hereafter have, because of any matter or thing which happened before the signing of this paper: and particularly, but not only because of  an injury to left middle finger while onboard the F/V LUKE & SARAH while at sea on or about March 22, 1997.

## THIS IS A RELEASE

I know that in signing this release I am taking the risk that I may have other injuries, illnesses or disabilities that I do not now know of from the particular occurrence described above or from some other occurrence before the signing of this paper. I also know that I am taking the risk that the injuries, illnesses or disabilities I do know of may be or may turn out to be worse than they now seem to me or to the doctors I have seen. I take all these risks. I know I am giving up the right to any further money. I am satisfied.

I understand and agree that the money paid to me now is received by me in full settlement and satisfaction of all claims and demands whatsoever.

**The following is to be filled in by the Claimant himself in his own handwriting, if he can write.**

1. Have you read this paper?  A.. Yes

(Write here either "Yes" or "No")

2. Has this paper been read to you?  A.. Yes

(Write here either "Yes" or "No")

3. Do you know what this paper is that you are signing?  A.. Yes

(Write here either "Yes" or "No")

4. What is this paper which you are signing?  A.. release

5. Do you know that signing this paper settles and ends **EVERY RIGHT AND CLAIM YOU HAVE FOR DAMAGES AS WELL AS FOR PAST, PRESENT AND FUTURE MAINTENANCE, CURE, AND WAGES?** A.. Yes

discharge; XXXX and Bankers  ... and ... Sunderland
Marine Mutual Insurance Company Ltd.; Salvus Bain (Management) Ltd.;
Royal Insurance; Ocean Marine Underwriters, Inc.; Hull and Cargo Surveyors, Inc./
USP&I Agency, their
heirs, executors, administrators, successors and assigns, and all his or their vessels and in particular the  F/V LUKE & SARAH  (ON 906149)

and the owners, operators, agents, charterers, masters, officers, and crews, of said vessels of each and every right or claim which I now have, or may hereafter have, because of any matter or thing which happened before the signing of this paper: and particularly, but not only **because of** an injury to left middle finger while onboard the F/V LUKE & SARAH while at sea on or about March 22, 1997.

### THIS IS A RELEASE

I know that in signing this release I am taking the risk that I may have other injuries, illnesses or disabilities that I do not now know of from the particular occurrence described above or from some other occurrence before the signing of this paper. I also know that I am taking the risk that the injuries, illnesses or disabilities I do know of may be or may turn out to be worse than they now seem to me or to the doctors I have seen. I take all these risks. I know I am giving up the right to any further money. I am satisfied.

I understand and agree that the money paid to me now is received by me in full settlement and satisfaction of all claims and demands whatsoever.

**The following is to be filled in by the Claimant himself in his own handwriting, if he can write.**

1. Have you read this paper?  A. .... *Yes* ........
   (Write here either "Yes" or "No")

2. Has this paper been read to you?  A. .... *Yes* ....
   (Write here either "Yes" or "No")

3. Do you know what this paper is that you are signing?  A. .... *Yes* ....
   (Write here either "Yes" or "No")

4. What is this paper which you are signing?  A. .... *release* ....

5. Do you know that signing this paper settles and ends **EVERY RIGHT AND CLAIM YOU HAVE FOR DAMAGES AS WELL AS FOR PAST, PRESENT AND FUTURE MAINTENANCE, CURE, AND WAGES?**  A. .... *Yes* ....
   (Write here either "Yes" or "No")

THEREFORE, I am signing my name near the seal to show that I understand and mean everything that is written by or for me on this paper.

I am signing this of my own free will.  .............................., 19 .........

**SIGN HERE** ➤





**Claimant, if he wishes to sign, should write his name upon the words "THIS IS A RELEASE" immediately above.**

## Certificate of Witnesses

We, the undersigned, do hereby certify that the Release on the reverse side of this paper was executed in our presence and that said Claimant acknowledged that ...*he*... fully
<small>(he or she)</small>
understood its contents and meaning and executed the same as ...*his*... free act and deed
<small>(his or her)</small>
and for the sole consideration therein expressed.

WITNESS our hands and seals on the day, month and year aforesaid.

_____ (SEAL)   416 Spruce St. SF CA 94118   12/2/97
**(Name)**                       **(Address)**

_____ (SEAL)   625 El Dorado #167, Oakland 94612   12/2/9
**(Name)**                       **(Address)**

_____ (SEAL)   124 Highland Avenue, S.F. CA 94014   12/2/97
**(Name)**                       **(Address)**

## Acknowledgment Before Notary Public or Commissioner of Deeds

STATE OF ...........................⎫
                                    ⎬ ss.:
COUNTY OF ..........................⎭

On the date of the execution of the Release on the reverse side of this paper before me personally came said Claimant, known to me to be the individual described in and who executed this Release, and acknowledged that ........fully understood its contents and meaning and duly
<small>(he or she)</small>
executed the same as ........free act and deed and for the sole consideration therein expressed.
<small>(his or her)</small>

(SEAL REQUIRED)

## Certificate of Interpreter

I hereby certify that the Release on the reverse side of this paper was executed in my presence by said Claimant and that I correctly and accurately translated the entire Release from the English language into the mother tongue of said Claimant and ...... acknowledged
<small>(he or she)</small>
that ........fully understood its contents and meaning and executed the same as ........free
<small>(he or she)</small>                                                   <small>(his or her)</small>
act and deed and for the sole consideration therein expressed.

INTERPRETER

ADDRESS

_(signature)_ (SEAL) 416 Spruce St. SF CA-94118 12/2/97
**(Name)** **(Address)**

_(signature)_ (SEAL) 625 El Dorado #107, Oakland 94612 12/2/9
**(Name)** **(Address)**

_(signature)_ (SEAL) 124 Highland Ave., S.F. CA 94014 12/2/97
**(Name)** **(Address)**

## Acknowledgment Before Notary Public or Commissioner of Deeds

STATE OF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . }
                                                                            } ss. :
COUNTY OF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . }

On the date of the execution of the Release on the reverse side of this paper before me

personally came said Claimant, known to me to be the individual described in and who executed

this Release, and acknowledged that . . . . . . . fully understood its contents and meaning and duly
**(he or she)**

executed the same as . . . . . . . free act and deed and for the sole consideration therein expressed.
**(his or her)**

(SEAL REQUIRED)                                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Certificate of Interpreter

I hereby certify that the Release on the reverse side of this paper was executed in my

presence by said Claimant and that I correctly and accurately translated the entire Release

from the English language into the mother tongue of said Claimant and . . . . . . acknowledged
**(he or she)**

that . . . . . . . fully understood its contents and meaning and executed the same as . . . . . . . free
**(he or she)**                                                                                      **(his or her)**

act and deed and for the sole consideration therein expressed.

                                                            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                                                          INTERPRETER

ADDRESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Certificate of Person Who Reads Release to Claimant

I hereby certify that before the Release on the reverse side of this paper was executed

by the Claimant, I correctly read the entire Release to the Claimant and _he_ acknowledged
                                                                            **(he or she)**

that _she_ fully understood its contents and meaning.
**(he or she)**

                                                            _Jacci Ferguson_

ADDRESS . . . . . . . . . . . . _No. California Street  Ste 2380_





**PATRICK A. FAYLE**
ATTORNEY AT LAW

2358 SOUTH COUNTY TRAIL
EAST GREENWICH, RI 02818

TEL (401) 886-5004
FAX (401) 886-5100

July 22, 1997

Mr. Scott Traudt
P.O. Box 3098
Winnemaka, Nevada 8946

      Re:    Personal Injury ICO Scott C. Traudt (3/21/97)

Dear Scott:

      I am sorry I missed your telephone calls yesterday.  Having you out west is not particularl[y]
condusive to moving this case along.  However, I do think we can get some sort of settlement ou[t]
of the insurance people, hopefully, in the near future.  It is my understanding that you did n[o]
make your June 20th follow-up with Dr. Coppes.  Consequently, he has you fit to return from
work as of May 28, 1997.  Please advise if you have seen any other doctors who think otherwise
Once you get a telephone, let me know the number.  Lastly, as you can see, I have moved.

      Keep in touch.

                    Sincerely,

                    Patrick A. Fayle

## RETAINER AGREEMENT

SCOTT C. TRAUDT ("the Client"), hereby retains ATTORNEY PATRICK FAYLE ("the Attorney"), to represent the Client and do such things necessary and proper to prosecute any and all of the claims against any person or persons, entity or entities responsible for injuries and/or damages sustained in an accident at sea which occurred on board F/V LUKE AND SARAH on or about March 21, 1997 and for injuries sustained, maintenance and cure, and disability arising therefrom.

The Attorney will investigate the claims, initiate demand, prosecute the claim attempt to settle the claims in the Client's interest. In the event that settlement forthcoming, the Attorney will institute legal action and/or enter into legal already filed, and prosecute that suit to conclusion.

FEES: The Attorney, shall receive as his fee One-Third (1/3) of any gross rec The Attorney is hereby given a lien for his fees and advances upon any settle judgment or award made or secured herein. If no recovery is obtained, the At... will receive no fee. The contingent fee set forth above is not set by law, but is negotiable between the Attorney and the Client. The Attorney is given a lien on the claim or cause of action, on any sum recovered by way of settlement, and on any judgment that may be recovered, for the sum and share mentioned above, as the firm's fee for costs expended.

COSTS: The Client will reimburse any costs expended by the Attorney, including, but not limited to, costs of investigators and other experts at the time such costs are incurred. Such investigators and other experts may be employed at the discretion of the Attorney. Any costs chargeable to the Client and not paid when incurred shall be deducted from Client's share of the recovery after the deduction of the Attorney's fees.

EMPLOYMENT OF EXPERTS AND INVESTIGATORS: The Attorney, in his discretion, may employ experts to examine persons or property involved in this matter. The Attorney may also, in his discretion, employ expert investigators to investigate the facts surrounding this matter. All such experts shall report exclusively to the Attorney. Fees charged by such expert witnesses and investigators are costs as set forth above.

FAVORABLE OUTCOME NOT WARRANTED: The Attorney makes no warranties or representations concerning the successful termination of these claims or the favorable outcome of any legal action that may be filed and does not warrant or guarantee that the Attorney will obtain reimbursement for the Client of any of his costs or expenses resulting from the personal injuries out of which the claim arises.

POWER OF ATTORNEY TO EXECUTE DOCUMENTS: The Client hereby gives the Attorney power of attorney to execute all documents connected with the claim for

prosecution of which the f⬤ is retained, including pleadi⬤, contracts, commercial paper, verifications, dismissals, orders, and all other documents that the Client could properly execute; no dismissal or settlement of client's cause of action will be made without the consent and approval of the Client.

I have read and agree to this Retainer Agreement and hereby acknowledge receipt of a copy.

THE CLIENT

SCOTT C TRAUDT

DATE: 5/14/97

THE ATTORNEY

PATRICK A. FAYLE

DATE: 9/05/14

01/29/97   11:44   ☎702 623 0430   HUMBOLDT LIBRARY   ☒001

Attachment G    401 886 5100

July 29, 1997

Patrick:

Got your letter...here's some things to note—

1. I was discharged by Dr. Coppes on May 28 because I had to. Since Stoddard and his band of bloodsucking bourgeoisie capitalist pigs had cut off my massive $15 a day maintenance, and refused compensation, and my TDI was exhausted, the only means of official income I had was to get unemployment. And to qualify, you have to be "available to work." My finger isn't healed, and it still throbs out here in the desert. I asked to be discharged because I had no choice.

2. I blew off the June 28th appointment because Coppes told me it was just to measure my range of motion, which is quite diminished. IT IS ACTUALLY WORSENING OUT HERE, AND THE PAIN IS MORE PRONOUNCED. I have an appointment 13 AUG with Coppes back in RI. I will be in RI from 11 AUG to 17 AUG.

3. Business may once again take me back to the Mideast in September...I may be gone and unreachable for a couple of months...this brings me to point 4.

4. The word at the docks is that these finger injuries usually settle at around $40,000. If there is no settlement offer at this amount by 10 AUG, you are to sue. $75,000 compensatory and $150,000 punitive. We can get my deposition in when I am home.

I'm here in Winnemucca for the immediate future. I've got my decks cleared for four weeks because I broke my right arm being a hero against the Navy's EOD softball team from Fallon, NV. We can use my down time to resolve this case and settle, or we can get my involvement out of the way and proceed to trial.


Show me the money,



Scott Traudt
POB 3098
Winnemucca NV 89446
(702) 623-9902


rec'd 970729
          1645

result of an injury he sustained aboard F/V LUKE AND SARAH in March of 1997? On what date? Where?

ANSWER: Yes; On May 14, 1997; In my then offices located at 1130 Ten Rod Road, North Kingstown, RI.

4.     Did you live up to the terms of this Agreement?

ANSWER: Yes.

5.     Did you ever file suit on Traudt's behalf in the matter described in #3?

ANSWER: No.

6.     Did you ever interview witnesses in the matter described in #3?

ANSWER: No.

7.     Did you ever visit the vessel described in the matter described in #3?

ANSWER: No.

8.     How many times did Traudt instruct you to sue the F/V LUKE AND SARAH?

ANSWER: I do not recall specifically the number, however, each and every time the Defendant and I discussed filing suit I was able to persuade Defendant to continue with the ongoing settlement negotiations as they were, in my opinion, proceeding well under the circumstances.   This was because Defendant was in Nevada at the time and I had difficulty communicating with him.   I would note that records of any and all communications with Defendant during this period have been available to Defendant in my offices since December 23, 1998.  These records have not been mailed to Defendant as they include x-rays which I did not think should be placed in the mail.

9.     How many times did you receive correspondence from Traudt instructing you to sue the F/V LUKE AND SARAH?

ANSWER: I do not recall, however, each and every time the Defendant sent such correspondence I was able to persuade Defendant to continue with the

2

Attachment H
Interrg Answers of

ongoing settlement negotiations as they were proceeding well. This was because, as noted above, Defendant was in Nevada at the time and I had difficulty communicating with him. I would note again that records of any and all communications with Defendant during this period have been available to Defendant in my offices since December 23, 1998. These records have not been mailed to Defendant as they include x-rays which I did not think should be placed in the mail.

10.    How many times did you talk with Traudt on the phone and Traudt instructed you during those conversations to sue the F/V LUKE AND SARAH?

ANSWER: I do not recall, however, each and every time the Defendant and I spoke on the telephone I was able to persuade Defendant to continue with the ongoing settlement negotiations as they were proceeding well. This was because, as noted above, Defendant was in Nevada at the time and I had difficulty communicating with him. I would note that records of any and all communications with Defendant during this period have been available to Defendant in my offices since December 23, 1998. These records have not been mailed to Defendant as they include x-rays which I did not think should be placed in the mail.

11.    Were you aware that as a result of Traudt's injuries he could not work for a certain period of time?

ANSWER: I do not recall if there was a period of time that Defendant was totally incapacitated for work as a result of the injuries suffered on board F/V LUKE AND SARAH. I do know that sometime in June of 1997 Defendant informed me he was going out west to work and that in July of 1997 Defendant apparently broke his right arm playing softball. He may have been unable to work after that incident for a period of time.

12.    Were you aware  that under Admiralty Law and the Jones Act, Traudt could recover damages for his injuries?

ANSWER:  Yes.

13.    How many hours did you spend on Traudt's personal injury case against the F/V LUKE AND SARAH between the time you were retained by him until the time he fired you in late 1977?

3

*Attachment I*
*Depo Interrog Answ. Patrick Fayle*

14. Fayle did not file suit on behalf of Traudt. (**Appendix F: Fayle Answers to Interrogatories, Number 5, dated March 11, 1999**).

Fayle: *Plaintiff admits that he did not file suit and the simple reason for that was that settlement negotiations were still ongoing at the time Defendant terminated the services of Plaintiff. Plaintiff would note that, after terminating Plaintiff, Defendant had every right to hire another attorney to file suit on his behalf as the statute of limitations did not expire until on or about March 20, 2000. Instead, Defendant took the easy way out and settled this matter for a mere $2000 over the settlement figure negotiated by Plaintiff. Defendant's argument that his financial situation required a quick settlement belies the fact that he supposedly found employment I Nevada and that he had already been able to exist for some 20 months since suffering his alleged injury;*

**Comment:** Fayle repeatedly stated to Traudt that negotiations were going well with the insurance adjuster. They were going so well, in fact, that Fayle refused to commence suit despite numerous pleas from Traudt to do so. He stated that when Traudt wanted to sue he *"was able to persuade Defendant to continue with the ongoing settlement negotiations as they were proceeding well."*

He later said this in answer to the Rhode Island Supreme Court's Disciplinary Counsel in answering Traudt's bar complaint against him: *"The fact that six months had passed since the Agreement [the retainer agreement] had been signed was due to a combination of unresponsiveness on the part of the insurance carrier..."* (**Appendix I: pg. 4, para. 2**)

As for the rest of Fayle's assertions, he again demonstrates a remedial need for mathematics; Traudt was not working for 20 months in Nevada at the time he fired Fayle. Traudt had been there from approximately June 25th to December 1st, 1997, which adds up to 6 months.

Assuming, *arguendo*, that Traudt could have hired another attorney, Fayle is challenged here to prove that an admiralty attorney could've been found in Winnemucca, Nevada – a cattle town in a desert state located in the mountainous southern ranges of the Sierra Nevadas.

15. Fayle did not interview any witnesses to Traudt's injury. (**Appendix F**).

Fayle: *Plaintiff agrees that he did not interview any witnesses to Defendant's injury, that is, assuming of course that such an injury took place aboard the vessel;*

16. Fayle did not ever visit the vessel *Luke and Sarah*. (**Appendix F**).

Fayle: *Plaintiff agrees that he did not visit the F/V LUKE AND SARAH;*

17. Traudt repeatedly told Fayle to commence suit in this matter. (**Appendix G: June 21st, 1997 letter from Traudt to Fayle; Appendix H: July 29, 1997 letter from Traudt to Fayle**)





# THE 1997 HHS POVERTY GUIDELINES

## One Version of the [U.S.] Federal Poverty Measure

[ Latest Poverty Guidelines ]
[ Summary Figures and *Federal Register* References – Poverty Guidelines Since 1982 ]
[ Information Contacts/References – Poverty Guidelines & Thresholds – Also History of U.S. Poverty Lines ]
[ Is There a Single Definition of "Income" That is Used with the Poverty Guidelines? ]

There are two slightly different versions of the federal poverty measure:

- the poverty thresholds, and
- the poverty guidelines.

The **poverty thresholds** are the original version of the federal poverty measure. They are updated each year by the **Census Bureau** (although they were originally developed by Mollie Orshansky of the Social Security Administration). The thresholds are used mainly for **statistical purposes** — for instance, preparing estimates of the number of Americans in poverty each year. (In other words, all official poverty population figures are calculated using the poverty thresholds, not the guidelines.) Poverty thresholds since 1980 and weighted average poverty thresholds since 1959 are available on the Census Bureau's Web site.

The **poverty guidelines** are the other version of the federal poverty measure. They are issued each year in the *Federal Register* by the **Department of Health and Human Services** (HHS). The guidelines are a simplification of the poverty thresholds for use for **administrative** purposes — for instance, determining financial eligibility for certain federal programs.

The full text of the *Federal Register* notice with the 1997 poverty guidelines is available here.

The poverty guidelines are sometimes loosely referred to as the "federal poverty level" (FPL), but that phrase is ambiguous and should be avoided, especially in situations (e.g., legislative or administrative) where precision is important.

A more extensive discussion of poverty thresholds and poverty guidelines is available on the Institute for Research on Poverty's Web site.

## 1997 HHS Poverty Guidelines

| Size of Family Unit | 48 Contiguous States and D.C. | Alaska | Hawaii |
|---|---|---|---|

Case 2:03-cv-00180-wks    Document 1    Filed 06/25/03    Page 40 of 44

| | | | |
|---|---|---|---|
| 1 | $ 7,890 | $ 9,870 | $ 9,070 |
| 2 | 10,610 | 13,270 | 12,200 |
| 3 | 13,330 | 16,670 | 15,330 |
| 4 | 16,050 | 20,070 | 18,460 |
| 5 | 18,770 | 23,470 | 21,590 |
| 6 | 21,490 | 26,870 | 24,720 |
| 7 | 24,210 | 30,270 | 27,850 |
| 8 | 26,930 | 33,670 | 30,980 |
| For each additional person, add | 2,720 | 3,400 | 3,130 |

SOURCE: *Federal Register*, Vol. 62, No. 46, March 10, 1997, pp. 10856-10859.

The separate poverty guidelines for Alaska and Hawaii reflect Office of Economic Opportunity administrative practice beginning in the 1966-1970 period. Note that the poverty thresholds — the original version of the poverty measure — have never had separate figures for Alaska and Hawaii.

The poverty guidelines apply to both aged and non-aged units. The guidelines have never had an aged/non-aged distinction; only the Census Bureau (statistical) poverty thresholds have separate figures for aged and non-aged one-person and two-person units.

Programs using the guidelines (or percentage multiples of the guidelines — for instance, 130 percent of the guidelines) in determining eligibility include Head Start, the Food Stamp Program, the National School Lunch Program, and the Low-Income Home Energy Assistance Program. Note that in general, cash public assistance programs (Aid to Families with Dependent Children and its block grant successor, and Supplemental Security Income) do NOT use the poverty guidelines in determining eligibility. The Earned Income Tax Credit program also does NOT use the poverty guidelines to determine eligibility.

The poverty guidelines (unlike the poverty thresholds) are designated by the year in which they are issued. For instance, the guidelines issued in March 1997 are designated the 1997 poverty guidelines. However, the 1997 HHS poverty guidelines only reflect price changes through calendar year 1996; accordingly, they are approximately equal to the Census Bureau poverty thresholds for calendar year 1996. (The 1996 thresholds will be issued in final form about September or October 1997; a preliminary version of the 1996 thresholds is now available from the Census Bureau.)

Go to the page of Information Contacts and References on the Poverty Guidelines, the Poverty Thresholds, and the Development and History of U.S. Poverty Lines.

Return to the Poverty Guidelines, Research, and Measurement main page.

Last updated on 01/07/02

Attachment L

## AFFIDAVIT

The undersigned hereby states as follows:

1. That I am currently the bookkeeper for the F/V Luke & Sarah and have been since 1996.

2. That Scott Traudt made two trips on the F/V Luke & Sarah, for a 3/4 share as a temporary worker, and was paid the following sums:

> Trip ending March 16, 1997:   $5798.26
> Trip ending March 31, 1997:   $1627.02

3. That Scott Traudt was provided with a written breakdown of the crew share for both trips he made, copies of which are attached.

4. That the records Scott Traudt seeks with regard to the payroll of the F/V Luke & Sarah contain confidential income, expense and business information of the owner of the vessel as well as confidential income and personal information of individual identified crew members.

5. That attached hereto is a true copy of a Release executed by Scott Traudt in connection with a claim for injury aboard the F/V Luke & Sarah in 1997.

_Cynthia Duckworth_
Cynthia Duckworth

Subscribed and sworn to before me this ___15TH___ day of June, 2003.

_____
Notary Public
My Commission Expires: 10-02-05

C:\MyFiles\Litigation\Wood Hollow\Affidavit CD.wpd


COPY

F/V LUKE SARAH

| | |
|---|---|
| GROSS STOCK | 137939.45 |
| BROKERAGE | 6896.97 |

TRIP EXPENSE

| | |
|---|---|
| FUEL | 5829.40 |
| LAND.EXP | 0.00 |
| LUMPING | 0.00 |
| ICE | 0.00 |
| LUBE OIL | 0.00 |
| HYD.OIL | 0.00 |
| FILTERS | 374.47 |
| LEGAL | 0.00 |
| SUPPLIES | 0.00 |
| BOATRACS | 323.24 |
| BOXES | 6915.00 |
| FREON | 0.00 |
| TOTAL | 13442.11 |

BOAT EXPENSE     3234.01

| | |
|---|---|
| SETTLEMENT # | 9709 |
| DATE PAID | 03/31/97 |
| DATE LANDED | 03/16/97 |

| | |
|---|---|
| BOAT % | 0.55 |
| BOAT SHARE | 64680.20 |
| CREW SHARE | 52920.17 |
| NET CREWSHARE | 52184.30 |
| $PER SHARE | 966.38 |
| CHECK | 137939.45 |
| # SHARES | 54.00 |
| PERSONALS | 0.00 |

CREW EXPENSE

| | | |
|---|---|---|
| | FOOD | 735.87 |
| TWINE | LABOR | 0.00 |
| | MISC | 0.00 |
| | TOTAL | 735.87 |

F/V LUKE SARAH

| | | SETTLEMENT # | 9710 |
|---|---|---|---|
| GROSS STOCK | 45751.65 | DATE PAID | 04/11/97 |
| BROKERAGE | 0.00 | DATE LANDED | 03/31/97 |

TRIP EXPENSE

| | | | |
|---|---|---|---|
| | | BOAT % | 0.55 |
| FUEL | 7047.94 | BOAT SHARE | 19196.60 |
| LAND.EXP | 0.00 | CREW SHARE | 15706.31 |
| LUMPING | 0.00 | NET CREWSHARE | 14643.18 |
| ICE | 128.05 | $PER SHARE | 271.17 |
| LUBE OIL | 839.97 | CHECK | 45751.65 |
| HYD.OIL | 0.00 | # SHARES | 54.00 |
| FILTERS | 292.74 | PERSONALS | 721.01 |
| LEGAL | 0.00 | | |
| SUPPLIES | 0.00 | CREW EXPENSE | |
| BOATRACS | 0.00 | FOOD | 964.58 |
| BOXES | 2540.05 | TWINE. LABOR | 0.00 |
| FREON | 0.00 | MISC | 98.55 |
| TOTAL | 10848.75 | | |
| | | TOTAL | 1063.13 |

BOAT EXPENSE          959.83

